

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*

*One Saint Andrew's Plaza*
*New York, New York 10007*

February 29, 2008

<u>BY HAND</u>

The Honorable Naomi Reice Buchwald
United States District Judge
Southern District of New York
500 Pearl Street, Room 2270
New York, New York 10007

      Re:    <u>United States v. Christopher Colombo</u>
            04 Cr. 273 (NRB)

Dear Judge Buchwald:

      Defendant Christopher Colombo is scheduled to be sentenced on Thursday, March 6, 2008 at 4:30 p.m. The Government respectfully submits this letter brief to respond to the defendant's February 22, 2008 sentencing memorandum and to set forth its view of the appropriate sentence.

      At trial in early 2007, a jury convicted Colombo on the two gambling charges in the Indictment, acquitted him of two loansharking counts, and could not reach a verdict on the substantive RICO count, the RICO conspiracy count, and on four other loansharking counts. The Government has decided not to proceed on the unresolved counts against Colombo, and we will move to dismiss those counts at sentencing. Based on Colombo's convictions, the Probation Office, in its Presentence Investigation Report ("PSR"), determined that the total offense level for Colombo is 16, and that his Criminal History Category was I, resulting in a Sentencing Guidelines range of 21 to 27 months' imprisonment. The Government agrees with the Probation Office's calculations.

      For the reasons stated below, it is this Office's position that a sentence at the top of the Guidelines range, i.e., 27 months' imprisonment, is appropriate and reasonable in this case.

### Background

      Indictment 04 Cr. 273 (NRB) charged Colombo and 18 other men with numerous offenses, including racketeering enterprise (RICO) counts, extortion, gambling, loansharking, mail fraud, and commercial bribery. Out of 19 defendants, 15 have received felony convictions to date either through convictions at trial or through guilty pleas; all except for Nunzio

Flaccavento (who was acquitted at trial), Joseph Flaccavento (who pled to a misdemeanor count), Philip Dioguardi (who died around the time of the indictment), and Francis Altieri (whose retrial is set for June 2008 before this Court). The charges in this case centered on the criminal enterprise directed and supervised by Christopher Colombo and his brother and co-defendant Anthony Colombo. Christopher Colombo oversaw the gambling and loansharking operations, while Anthony Colombo, in conjunction with co-defendant John Contino, directed the fraud perpetrated on Domenic Fonti and his company, EDP.

As noted above, Colombo was convicted at trial of Count Three, gambling conspiracy, in violation of Title 18, United States Code, Section 371, and Count Four, operation of an illegal gambling business, in violation of Title 18, United States Code, Section 1955. The statutory maximum term of imprisonment for each offense is five years' imprisonment, meaning that the statutory maximum term of imprisonment Colombo faces is 10 years' imprisonment. The jury acquitted Colombo of two counts, the loansharking offenses involving Randy Margulies and Mark LNU. In addition, the jury could not reach a verdict on the loansharking offenses involving John Sitterly and Richard Kelly, two other loansharking conspiracy counts, the RICO substantive charges, and the RICO conspiracy charge.

The evidence adduced at trial overwhelmingly demonstrated that Colombo was the undisputed leader of a large-scale, long-term, and highly profitable illegal gambling business. In numerous phone calls intercepted pursuant to court-authorized wiretaps, Colombo was recorded speaking to his deputies and workers in the illegal gambling business, calling in the betting results, dealing with his employees' payroll, and giving orders about how to conceal the illegal operation from law enforcement.

As explained more fully below, the nature and circumstances of the offense, the history and characteristics of the defendant, and Colombo's role warrant a lengthy jail sentence.

## Discussion

### A.     Procedure for Determining Colombo's Sentence

While the Guidelines no longer play a mandatory role at sentencing, they nevertheless continue to play a critical role in achieving the "basic aim" set forth by Congress in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." *United States* v. *Booker*, 125 S. Ct. 738, 760 (2005). In furtherance of that goal, judges are required to "consider the Guidelines 'sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant,' § 3553(a)(4), the pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims, §§ 3553(a)(1), (3), (5)-(7) (main ed. and Supp. 2004)." *Id.* at 764.

In *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005), the Second Circuit explained that district courts should now engage in a three-step sentencing procedure in light of *Booker*. First, the court must determine the applicable Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." *United States* v. *Crosby*, 397 F.3d at 112. Second, the court should consider whether a departure from the Guidelines range is appropriate. *Crosby*, 397 F.3d at 112. Third, the court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)" and determine the sentence to impose. *Id.* at 113. A failure to consider the Guidelines range and to simply select a sentence without such consideration is error. *Id.* at 115.

The Second Circuit has mandated that district judges must consider the Guidelines "faithfully" when sentencing. *Crosby*, 397 F.3d at 114. As the Second Circuit has said, "*Booker* did not signal a return to wholly discretionary sentencing." *United States* v. *Rattoballi*, 452 F.3d 127, 132 (2d Cir. 2006) (citing *Crosby*, 397 F.3d at 113). Indeed, the Guidelines range for a particular defendant is "a benchmark or a point of reference or departure" when considering a particular sentence to impose. *United States* v. *Rubenstein*, 403 F.3d 93, 98-99 (2d Cir.), *cert. denied*, 126 S. Ct. 388 (2005). As the Second Circuit observed, the Guidelines:

> "cannot be called just 'another factor' in the statutory list, 18
> U.S.C. § 3553(a), because they are the only integration of the
> multiple factors and, with important exceptions, their calculations
> were based upon the actual sentences of many judges."

*United States* v. *Rattoballi*, 452 F.3d at 133 (quoting *United States* v. *Jimenez-Beltre*, 440 F.3d 514, 518 (1st Cir. 2006) (*en banc*)). "[I]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *United States* v. *Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006); *see also Rita* v. *United States*, 127 S. Ct. 2456, 2462-63 (2007) (noting that "presumption of reasonableness" applies on appeal to sentences within Guidelines sentencing range). The Crosby court added that "it is important to bear in mind that Booker/Fanfan and Section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge." *Crosby*, 397 F.3d at 113.

As the Supreme Court very recently reiterated, because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall* v. *United States*, 128 S. Ct. 586, 594 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id*. at 596; *United States* v. *Rattoballi*, 452 F.3d 127, 133 (2d Cir. 2006). The Supreme Court also recently observed that, "We have accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough

approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough* v. *United States*, 128 S. Ct. 558, 574 (2007) (quoting *Rita*, 127 S. Ct. at 2464-65).

In determining a defendant's sentence, the district court may consider "any appropriate evidence," *United States* v. *Prince*, 110 F.3d 921, 925 (2d Cir. 2002), and "disputed facts relevant to sentencing . . . need be established only by a preponderance of the evidence." *United States* v. *Cusimano*, 123 F.3d 83, 90 (2d Cir. 1997) (citation and internal quotation marks omitted); *see also United States v. Gonzales*, 407 F.3d 118, 124 (2d Cir. 2005). In making its factual findings, a "sentencing court remains entitled to rely on any type of information known to it." *United States* v. *Concepcion*, 983 F.2d 369, 387 (2d Cir. 1992) (citing *United States* v. *Carmona*, 873 F.2d 569, 574 (2d Cir. 1989)). As such, a district court may rely even upon information related to charges to which the defendant was acquitted, so long as the Government has proven that conduct by a preponderance of the evidence. *See United States* v. *Watts*, 519 U.S. 148, 156-57 (1997) ("[A] jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence.). *See also United States* v. *SKW Metals & Alloys, Inc.*, 195 F.3d 83, 92-93 (2d Cir. 1999); *United States* v. *Reese*, 33 F.3d 166, 174 (2d Cir. 1994) ("[W]hen determining sentence, a sentencing court is free to consider hearsay evidence, evidence of uncharged crimes, dropped counts of an indictment and criminal activity resulting in acquittal.").

This settled law was not affected by the Supreme Court's decision in *Booker*. As the Second Circuit explained in rejecting a claim that *Booker* precluded reliance on "acquitted conduct," "the Sixth Amendment error is the mandatory use of the Guidelines enhancement, not the fact of the enhancement." *United States v. Williams*, 399 F.3d 450, 454 (2d Cir. 2005); *see also United States v. Vaughn*, 430 F.3d 518, 526 (2d Cir. 2005); *see also United States* v. *Magallanez*, 408 F.3d 672, 684-85 (10th Cir. 2005) (rejecting post-*Booker* claim that sentencing court erred in considering acquitted conduct); *United States* v. *Duncan*, 400 F.3d 1297, 1304-05 (11th Cir. 2005) (holding that *Booker* did not overrule uniform precedent allowing sentencing courts to consider acquitted conduct); *United States* v. *Ferby*, 2005 WL 1544802, at *4 (W.D.N.Y. July 1, 2005) ("*Watts* has not been expressly overturned by the Supreme Court and until it is, this Court is bound to follow it."); *United States* v. *Agostini*, 35 F. Supp. 2d 530, 534 (S.D.N.Y. 2005) ("*Booker* did not alter the court's ability to enhance a defendant's sentence on the basis of acquitted conduct."). To quote Justice Breyer in *Booker*, "when a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant." *Booker*, 125 S. Ct. at 750.

**B.** **Colombo's Statutory Sentencing Range Is a 10-Year Maximum**

Count Three, gambling conspiracy in violation of Title 18, United States Code, Section 371, carries a maximum statutory sentence of five years' imprisonment. *See* PSR ¶ 131. Count Four, operation of an illegal gambling business in violation of Title 18, United States Code, Section 1955, also carries a maximum statutory sentence of five years' imprisonment. *See id.* ¶ 132. Accordingly, Colombo's combined statutory maximum sentence is 10 years' imprisonment.

**C.** **Colombo's Sentencing Range Under the Guidelines is 21 to 27 Months' Imprisonment**

Colombo's sentencing range under the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") is 21 to 27 months' imprisonment, calculated as follows.

**1.** **Offense Level**

As the Probation Office correctly determined, the total offense level is 16. *See* PSR ¶¶ 85-94.

**a.** **Base Offense Level**

Pursuant to U.S.S.G. § 2E3.1(a)(1), the base offense level is 12.

**b.** **Role Enhancement**

Pursuant to U.S.S.G. § 3B1.1(a), the defendant receives a four-level enhancement for aggravating role because he "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive . . . ." U.S.S.G. § 3B1.1(a); *see also* PSR ¶ 88.

There can be no serious dispute about the applicability of this enhancement.

First, the gambling operation clearly involved at least five people. Indeed, numerous co-defendants pled guilty to participating in this gambling conspiracy, including Anthony Sedia, Geoffrey Hawthorne, Robert DiMartino, Paul Seipman, Leo Caldera, Eddie Robinson, Vincent LaRosa, Anthony DeFranco, and Joseph Hernandez. *See* PSR ¶ 5-14. And co-defendant John Berlingieri was convicted at trial of the gambling offenses in the Indictment. Moreover, when Berlingieri testified at trial, he confirmed on cross-examination that many other people participated in the illegal gambling business, including the people who answered the phones in the wire rooms, and including specifically the following co-defendants: Colombo,

Philip Dioguardi, Anthony Sedia, Eddie Robinson, Anthony DeFranco, and Robert DiMartino. Trial Transcript ("Tr.") 2996-97.

In addition, as discussed below more fully in Section D, the evidence at trial proved that the gambling operation was an organized, systematic, high-stakes gambling enterprise, which at times earned approximately $70,000 in one day. *See* GX 906-T, page 1, line 6. As Investigator Carillo testified, this was a large-scale gambling operation. Thus, the illegal gambling business easily satisfies the requirement in U.S.S.G. § 3B1.1(a) that the criminal activity "involved five or more participants or was otherwise extensive."

Second, the unchallenged evidence at trial showed that Colombo was "an organizer or leader" of this criminal activity. In short, this was *Colombo's* illegal gambling business. As Investigator Carillo testified, Colombo himself was the "bookmaker." Tr. 1021.

Investigator Carillo noted that in many of the recorded phone conversations, Colombo, the bookmaker, had conversations with people like Dioguardi, his "controller or manager," and Eddie Robinson, "a subordinate" of his to whom he provided the figures for the week's tallies of wins and losses. Tr. 1021-1022. Investigator Carillo also testified that one recorded conversation, GX 911, was "a typical phone call of somebody controlling the wire room, which would be Chris Colombo." Tr. 1018-19. Investigator Carillo reached this conclusion because Colombo was "talking about expenses inside the wire room, how he personally is getting hurt by how high the expenses are in the wire room . . . I had mentioned before clerks, controllers, managers inside the wire room are all salaried workers of the bookmaker." Tr. 1019.

Similarly, at trial, Berlingieri testified that after Dioguardi became sick, Berlingieri reported directly to Colombo in the illegal gambling business. Tr. 2996. Berlingieri acknowledged that it was his job to collect and drive the money, along with the gambling "work" – the betting slips and the tapes of phone calls that came into the wire room – up to Colombo at his home in Orange County, New York. Tr. 2997-98.

Furthermore, the court-authorized wiretap recordings demonstrated repeatedly that Colombo was in charge of the illegal gambling business, which had three wire rooms in Manhattan and one in the Bronx. On September 11, 2000, Colombo told Dioguardi in reference to someone who shorted them on money, "When you go there you tell him *I* make the shifts." GX 903-T, page 3, line 22 (emphasis added). On November 13, 2000, Colombo was very angry with an unidentified man who worked in one of his wire rooms. *See* GX 920. Colombo told the employee when the latter complained about one of the bettors, "There's a structure. If there is a problem, I told you, you just tell the agent." GX 920, page 3, line 19. And then, Colombo said, "If the agent doesn't straighten it out, you tell me." *Id.* line 22. In addition, on October 8, 2000,

Colombo demanded of an employee, "When am I getting the rest of *my money*, Brian?" GX 905-T, page 3, lines 17-18 (emphasis added).

These and many other phone recordings played at trial underscored that Colombo ran the gambling operation. He gave instructions to his deputy, Dioguardi, he asked about the employee payroll, he told Dioguardi to short someone's pay, he relayed the weekly figures to one of his bookkeepers, Eddie Robinson, and he told Dioguardi to relay the message to an employee that Colombo was the one who made the shifts at the wire rooms. Colombo was responsible for the staffing of the four wire rooms where the bets were collected. Berlingieri and Dioguardi delivered all the gambling "work" – the actual betting sheets and tapes – as well as the profits to Colombo at his home in Orange County. And Colombo paid the workers in this incredibly lucrative gambling operation, which sometimes earned up to $70,000 per day. *See* GX 906-T, page 1, lines 4-6.

In his submission, Colombo argues that he and Eddie Robinson were partners in and played the same role in the illegal gambling business, and therefore that he should receive the same sentence as Robinson. This is absurd, and is wholly unsupported by the evidence. Robinson was one of Colombo's employees, specifically, his accountant. As the recordings showed, Colombo would call Robinson with the weekly figures from the weekend's betting. In fact, Investigator Carillo described Eddie Robinson as "a subordinate" of Colombo's to whom he provided the figures for the week's tallies of wins and losses. Tr. 1021-1022. In contrast, Investigator Carillo testified that Colombo was the actual "bookmaker" – the owner of the whole gambling operation. Tr. 1021. All the other evidence supports this point, from the fact that both Berlingieri and Dioguardi reported to Colombo, as Berlingieri himself testified, to the fact that Colombo makes it clear that he makes the employees' shifts and is the final arbiter of problems with individual gamblers, to the fact that all the gambling work – and most importantly, the profits – were brought to Colombo himself. Thus, Colombo's claim that he and Robinson were on equal footing is totally fanciful.

In sum, the Probation Office is correct that Colombo deserves a four-level enhancement for acting as an "organizer or leader" of a "criminal activity that involved five or more participants or was otherwise extensive."

### c. Acceptance of Responsibility

Colombo deserves no acceptance of responsibility points.

Colombo went to trial on all counts that were pending against him. The trial lasted two months and the Government had to present evidence on all the counts, *including on the gambling conduct*. Thus, the Government had to devote several days of its two-week case-in-chief to the presentation of evidence to prove the gambling charges against Colombo and

Berlingieri.  This evidence included both numerous witnesses, including the vast majority of the law enforcement agents who conducted the searches of the wire rooms and Colombo's home, as well as many exhibits to help prove the gambling counts (betting slips, calculators, phones, tape recorders, etc.).

In Colombo's submission, he argues that he ought to receive acceptance points because he offered to plead guilty before trial but that the Government somehow prevented him from pleading guilty to the gambling counts.  This is false.  Colombo was always free to plead guilty before trial to the gambling counts, and the Government never prevented him from doing so.  But what Colombo sought was an agreement whereby he could plead guilty to the gambling counts in exchange for the Government's dismissing all the other counts against him.  That, of course, the Government was unwilling to do.  Thus, Colombo's claim that he was somehow impeded from pleading guilty to the gambling counts is completely misleading to the Court.

Colombo also claims that he accepted responsibility by admitting to the gambling conduct at trial.  But there is only one way to ensure a conviction on a given count, and that is by pleading guilty to that count.  By their nature, trials are filled with uncertainty.  Indeed, Colombo's counsel himself acknowledged this fact at trial.  During jury deliberations, the Court raised the idea of letting the jury know it could return a partial verdict, stating "They have to have reached, unless they totally missed it, two guilty verdicts, at least for two defendants, on gambling charges, right?"  Colombo's counsel responded, "The answer is that's what you would think, but I once was involved in a trial many years ago where I admitted something and the jurors came back and said, Why do we have to believe what Mr. Schneider said.  *So you never really know.*"  Tr. 3938 (emphasis added).  That is exactly right – *you never really know* – which is why Colombo went to trial on the gambling counts in order to put the Government to its proof and take the chance that the jury would acquit him.

Colombo does not deserve two points for acceptance of responsibility because Colombo's and his counsel's decision not to have Colombo plead guilty before trial was actually measured trial strategy.  That is, by acknowledging guilt of the gambling conduct but denying guilt of the loansharking conduct, Colombo and Berlingieri essentially suggested that the jury "split the baby."  It was no accident – nor a surprise – that counsel for Colombo and Berlingieri admitted that their clients were guilty of the gambling offenses in their opening statements.  This strategy reflected the fact that the proof on the gambling conduct was so overwhelming.  This move also represented an attempt to earn credibility with the jury from the beginning by admitting some of the charges but denying others.  But needless to say, had Colombo pled guilty to the gambling offenses before trial, this trial strategy would not have been available to him.  If Colombo had really accepted responsibility, he certainly could have pled guilty to the gambling counts before trial and then proceeded to trial only on the remaining counts.

Finally, and perhaps most importantly, at trial, defense counsel for Colombo made a clear appeal for jury nullification on the gambling charges. And this fact alone undermines *any claim* for acceptance of responsibility points. Because by definition, an appeal for a jury to nullify means asking a jury to agree that "gambling is not so bad, everybody does it, and thus you should not find them guilty of this conduct."

For example, in his summation, Colombo's counsel made a blatant appeal for jury nullification:

> Now that I have accepted the fact that there is overwhelming evidence of guilt because he is in fact guilty of being who he is, a gambler, a bookie, let's look at – and remember, this is not a referendum on gambling. This is not a decision that you have to make whether you think it's a service to our society or a sin on our society. But the fact is it exists and it's so much a part of the thread, of the makeup of our society. Go down, take the elevator outside here, go downstairs –

> [Government's objection to this argument overruled]

> Take the elevator, go down to the first floor, go buy yourself a Lottery ticket. Gambling is part of what this society is about. Look at the front page of the New York Post, the Friday before the Super Bowl. Ok? Office pools, betting, gambling, OTB, horse track, jai alai, it's what people do. I am not saying good. I am not saying bad. I am saying real. I am saying a part of what is going on. And that's what is important.

Tr. 3349-50. This lengthy disquisition on gambling in our society was intended to appeal to the jury to nullify the gambling charges against Colombo; such an appeal does not constitute genuine acceptance of responsibility.

At the sentencing of co-defendant Berlingieri in August 2007, the Government argued that for all these reasons, and particularly because of Berlingieri's appeal to the jury to nullify the gambling charges, he should not receive any acceptance points.[1] At that time, the

---

[1] At trial, Berlingieri's counsel raised the nullification suggestion to the jury through her cross-examination of the Government's gambling and loansharking expert witness, Investigator John Carillo. Counsel asked Carillo "In your experience, what type of people are the people who are betting?" Tr. 1050. She followed up by asking, "Lawyers or doctors?" and then asked, "In your experience as an expert in this field, do housewives bet?" Counsel asked no further questions of Investigator Carillo. The implication for the jury was clear: nullify these charges, gambling is not that serious, and everybody does it.

Court disagreed with the Government's argument as it pertained to Berlingieri, noting that the Government's argument focused on the much more prevalent appeal for jury nullification made by counsel for Colombo: "[the Government's sentencing submission for Berlingieri] spent a lot of time quoting from Mr. Schneider. But whatever Mr. Schneider said, he represents someone else." Berlingieri Sent. Tr. dated Aug. 22, 2007 at 19.

Based on the trial record, including the lengthy portion of Colombo's summation excerpted above, Colombo's counsel blatantly sought to have the jury nullify the gambling charges. Thus, in sharp contrast to Berlingieri's strategy whereby his counsel asked one witness several questions that indirectly suggested nullification, Colombo placed the nullification idea front and center before the jury in his summation. Accordingly, there is no valid basis for Colombo to receive acceptance of responsibility points.

One final point argues strongly against Colombo's receiving any acceptance points. Colombo blatantly lied to the Probation Office, which, of course, is an arm of this Court, when he told the Probation Officer in his interview that he never used any illicit substances, other than marijuana when he was a teenager. *See* PSR ¶¶ 115-16. That same day, December 18, 2007, Colombo provided a urine sample, which tested positive for cocaine. *See id*.

Thus, while still awaiting his sentencing, Colombo committed two violations. First, he lied to the Probation Office – both about his drug use and about his reported income, as discussed below. Second, he tested positive for cocaine. While the Probation Office deferred to the Court on the issue of whether Colombo should receive acceptance points, *see* PSR at 23 n.2, the Probation Officer informed the Court: "We note that at the time of the presentence interview, the defendant tested positive for cocaine, which is a factor that the Court may want to consider in determining whether the defendant qualifies for a reduction in his offense level pursuant to § 3E1.1 (*See* Application Note 1(b) of § 3E1.1)." PSR at p. 23 n.2. Application Note 1(b) explains that in determining whether a defendant has clearly demonstrated acceptance of responsibility, courts should consider "voluntary termination or withdrawal from criminal conduct." In this case, the positive cocaine test and the lies to the Probation Office hardly suggest that Colombo has withdrawn from criminal conduct.

Moreover, it is Colombo's burden to clearly demonstrate that he qualifies for an adjustment for acceptance of responsibility. U.S.S.G. § 3E1.1(a); *United States v. Giwah*, 84 F.3d 109, 113 (2d Cir. 1996); *see United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992). Even if a defendant pleads guilty, that "does not entitle the defendant to an acceptance reduction" because "the defendant must prove to the court that he or she has accepted responsibility." *Giwah*, 84 F.3d at 113. Indeed, even where a defendant has pled guilty, "other 'conduct . . . that is inconsistent with . . . acceptance of responsibility' may outweigh a guilty plea." *United States v. Hirsch*, 239 F.3d 221, 226 (2d Cir. 2001) (quoting U.S.S.G. §3E1.1, comment. (n.3)); *citing United States v. Fredette*, 15 F.3d 272, 277 (2d Cir. 1994)); *United States v. Guzman,* 282 F.3d

177, 184 (2d Cir. 2002). For example, the Second Circuit has noted that a sentencing judge may deny credit if, for example, a defendant engages in continued criminal conduct that "bespeaks a lack of sincere remorse." *United States v. Defeo,* 36 F.3d 272, 277 (2d Cir. 1994) (internal quotation and citation omitted). Here, Colombo's conduct – his positive cocaine test, his lying to the Probation Office, and his view that his gambling convictions amount to only a "petty offense," *see* Ex. B attached, Gangland News dated 2/1/08 at 3 – does indeed bespeak a lack of sincere remorse.

> For all these reasons, Colombo does not deserve any acceptance of responsibility points.

**2. Criminal History Category**

> On September 13, 1996, Colombo was convicted of promoting gambling in the second degree, a Class A misdemeanor, in violation of New York Penal Law 225.05, in Orange County, New York Court. Pursuant to U.S.S.G. § 4A1.1(c), this conviction results in 1 criminal history point. Accordingly, Colombo is in Criminal History Category I.

> A Guidelines offense level of 16 in Criminal History Category I results in a Guidelines sentencing range of 21 to 27 months' imprisonment.

**D. The Factors Set Forth in Section 3553(a) Warrant a Sentence of More than 27 Months' Imprisonment**

> Section 3553(a) provides that the sentencing "court shall impose a sentence sufficient but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," and then sets forth seven specific considerations:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

> (2) the need for the sentence imposed—

>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant;

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

   (3) the kinds of sentences available;

   (4) the kinds of sentence and the sentencing range established [in the Sentencing Guidelines];

   (5) any pertinent policy statement [issued by the Sentencing Commission];

   (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

   (7) the need to provide restitution to any victims of the offense.

  Applying these factors demonstrates that a sentence of 27 months' imprisonment is appropriate in this case.

**1. The Nature and Circumstances of the Offense and Colombo's History and Characteristics**

  The nature and circumstances of the offense and Colombo's history and characteristics weigh in favor of a sentence at the top of the Guidelines range. The following all constitute aggravating factors: (a) the magnitude of Colombo's illegal gambling business; (b) Colombo's active concealment of his criminal activity; (c) the longevity of Colombo's criminal activity; (d) Colombo's loansharking conduct, which amounts to highly relevant conduct; and (e) the fact that Colombo has engaged in crime as a livelihood and has not had steady legitimate employment. Moreover, unlike other co-defendants in this case, Colombo has no mitigating factors.

  **a. The Magnitude of Colombo's Illegal Gambling Business**

  The evidence at trial overwhelmingly established Colombo's guilt of the gambling charges and revealed the extensive scope and nature of his highly lucrative illegal gambling operation. Colombo's role and involvement in the gambling conspiracy was exceedingly well documented, through thousands of intercepted telephone calls, agent testimony, seized gambling

records from a court-authorized search warrant of his home, and the admissions of his co-defendant Berlingieri at trial.

Colombo was the leader of this gambling operation. As Investigator John Carillo (a former NYPD detective who was an expert witness on gambling and loansharking) testified, the illegal gambling business was "a large-scale operation." Tr. 1023. Colombo himself was the actual "bookmaker." Tr. 1021. Indeed, the evidence at trial proved that the gambling operation was an organized, systematic, high-stakes gambling enterprise that at times brought in approximately $70,000 in one day. GX 906-T, page 1, lines 4-6.

The recorded calls played at trial provided the Court with a clear window to observe how vast this criminal operation was. For example, on October 9, 2000, Colombo called co-defendant Eddie Robinson to provide him with the figures from the day's betting. *See* GX 907-T. During this call, Colombo provided the results for at least 27 different runners. *See id.* at page 2 (e.g., "Miggs is running minus 2295, Slim minus 28,690, Track minus 6293."); *see also* GX 912-T. As Investigator Carillo testified at trial, each of these people, i.e., "Miggs," "Slim," and "Track," are runners who work for the gambling business and have sheets, or lists, of individual bettors who place bets with those specific runners. *See* Tr. 1014-17. Thus, each of those 27 different runners had numerous different individual bettors making bets with them.

In short, Colombo ran an enormous gambling business. The fact that the operation had four different wire rooms in various boroughs of New York City again underscores the vast scope of the business. The magnitude of this illegal operation argues for a stronger sentence.

**b.    Colombo's Active Concealment of His Criminal Activity**

Colombo's active concealment of his illegal gambling business also weighs in the Court's Section 3553(a) analysis of the nature and characteristics of the offense. Colombo did not simply oversee and manage a gambling business. He and his employees took proactive steps to hide the illegal business from law enforcement. Again, this fact calls for a more serious punishment.

The recorded phone calls were rife with examples of this concealment. For example, on October 20, 2000, Colombo had a series of phone conversations with other people in the gambling operation. *See* GX 914-T. In this conversation, Anthony DeFranco said, "They're, they're gonna be making a big uh, move tomorrow and Sunday. We got to get out of where we are." Colombo then asked, "Who's making a big move?" and DeFranco responded, "You know who I am talking about." DeFranco then said he knew this information because it "came from One Police Plaza." *See id.* page 2, lines 10-15. Colombo and his co-conspirators

not only actively tried to evade police detection by moving their wire rooms, but they also apparently had a source at NYPD headquarters who was tipping them off about police activity.

Later, Colombo called Dioguardi and relayed the news about the law enforcement activity. *See* GX 914-T, page 3, line 16. Then Colombo called Eddie Robinson and told him, "Listen we gotta go tonight, okay?" And then he said, "Saturday and Sunday is going to be big sweeps. Confirmed." *See id.* page 5, lines 2 & 8.

Two weeks later, Colombo, Berlingieri, and an unidentified man spoke again about possible law enforcement scrutiny. *See* GX 918-T. Berlingieri told Colombo that "he said there was one guy there with a leather jacket, with salt and pepper hair." *See id.* page 3, lines 37-38. At trial, Berlingieri admitted he was referring to the police here. Later during this call, Colombo told an unidentified man that "Listen, they come and they take a look through the ... through the warrant. They have to do a physical inspection." *See id.* page 4, lines 58-63. It is clear that they were talking about law enforcement since the police obtain warrants and do a physical inspection.

Again, two months later, on January 12, 2001, Colombo called Berlingieri, who told him, "Listen, they just nailed that other guy around the corner." *See* GX 929-T, p. 1, lines 3-4. After Berlingieri told Colombo that it was "the Moral Squad," Colombo responded by saying, "Yeah, do me a favor, Saturday and Sunday, make a lookout?" *See id.* p. 2, lines 1, 21. Colombo added, "Let em put somebody out there… so you're safe coming up and going down." *See id.* p. 3, lines 2-4. And Colombo said, "I want you both to have a walkie talkie. You follow me?" *See id.* p. 3, lines 11-12.

In sum, all these discussions about lookouts, search warrants, and physical inspections were designed to prevent the illegal business from being detected and to conceal their illicit activities. These conversations make plain that Colombo and his co-conspirators had no doubt that they were engaging in criminal conduct.

### c. The Longevity of Colombo's Criminal Conduct

At the sentencing of co-defendant Gerard Clemenza, the Court explained that one of the reasons it had decided to give Clemenza a sentence of imprisonment below the Guidelines was because his participation in the criminal activity was very limited and was also limited to a very short period of time, perhaps about one month. While the Government respectfully disagreed that a non-Guidelines sentence was appropriate, the Court reasonably concluded that Clemenza engaged in the charged criminal conduct for a very short period of time.

In stark contrast, Colombo has been committing crimes for years. His gambling operation dates from at least approximately 1992 through 2002. For approximately 10 years, Colombo ran an illegal gambling business.

At trial, John Sitterly testified that he started betting with Nunzio Flaccavento, who worked for Colombo's gambling operation, in the late fall of 1992. *See* Tr. 1081. Sitterly continued betting with Flaccavento and Colombo until about 1999. *See id.* He was assigned a code name of "103 Ghost" that he was told to use when he called in to place his bets. *See* Tr. 1082. Sitterly's testimony about his code name was corroborated by one of the recorded conversations in which Colombo told Eddie Robinson how each of the runners who had the sheets of bettors fared over the weekend, and he said "Ghost minus 1995." *See* GX 927-T, p. 2, line 20. Thus, one of the code names used by the gambling operation was indeed "Ghost."

In addition, Colombo's prior gambling conviction arose from conduct that occurred from approximately April 1995 through November 1995, which overlapped with the conduct charged in the instant case. Police records from Colombo's Orange County case demonstrate that Colombo participated in an illegal gambling operation located at 26 North Street in Middletown, New York (Orange County). The evidence against Colombo in this related case included: law enforcement witnesses who surveilled Christopher Colombo entering and exiting the location of the illegal gambling business; surveillance photos; numerous wiretapped telephone calls involving illegal gambling; physical evidence including betting slips, tape recorders, and other physical and documentary evidence seized from both the gambling business at 26 North Street and the home of Christopher Colombo in Blooming Grove, New York; testimony of law enforcement agents that Christopher Colombo was arrested inside the gambling location with betting slips and other gambling documentation in front of him at the time the search warrants were executed; testimony that one of Christopher Colombo's co-defendants in the Orange County gambling case was Eddie Robinson, a co-defendant in the instant case; and Christopher Colombo's statements in his guilty plea allocution in which he pleaded guilty to promoting gambling.

Moreover, at trial, Berlingieri admitted that he began working with Dioguardi and Colombo in Colombo's gambling operation in approximately 1999, and continued working with them until approximately 2002. Tr. 2997.

In short, unlike Clemenza's, Colombo's criminal conduct was neither short-term nor limited. It was systematic, highly organized criminal activity that lasted for approximately 10 years. Thus, in terms of the nature and characteristics of the offense, the longevity of Colombo's criminal wrongdoing is yet another aggravating factor.

### d. Colombo's Loansharking Conduct Is Relevant Conduct

Colombo's loansharking crimes are highly relevant conduct to the gambling offenses for which he has been convicted, pursuant to U.S.S.G. § 1B1.3. As noted above, the jury acquitted Colombo of two loansharking counts – those involving Randy Margulies and Mark LNU. The jury could not reach a verdict on the loansharking offenses involving John Sitterly and Richard Kelly, two other loansharking conspiracy counts, the RICO substantive charges, and the RICO conspiracy charge. The Government respectfully submits that the Court can easily find by a preponderance of the evidence that Colombo committed the loansharking offenses involving Sitterly and Kelly.

The Second Circuit has held that in determining a defendant's sentence, the district court may consider "any appropriate evidence," *United States* v. *Prince*, 110 F.3d 921, 925 (2d Cir. 2002), and "disputed facts relevant to sentencing . . . need be established only by a preponderance of the evidence." *United States* v. *Cusimano*, 123 F.3d 83, 90 (2d Cir. 1997) (citation and internal quotation marks omitted); *see also United States v. Gonzales*, 407 F.3d 118, 124 (2d Cir. 2005). In making its factual findings, a "sentencing court remains entitled to rely on any type of information known to it." *United States* v. *Concepcion*, 983 F.2d 369, 387 (2d Cir. 1992) (citing *United States* v. *Carmona*, 873 F.2d 569, 574 (2d Cir. 1989)). As such, a district court may rely even on information related to charges on which the defendant was acquitted, so long as the Government has proven that conduct by a preponderance of the evidence. *See United States* v. *Watts*, 519 U.S. 148, 156-57 (1997) ("[A] jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence.). *See also United States* v. *SKW Metals & Alloys, Inc.*, 195 F.3d 83, 92-93 (2d Cir. 1999); *United States* v. *Reese*, 33 F.3d 166, 174 (2d Cir. 1994) ("[W]hen determining sentence, a sentencing court is free to consider hearsay evidence, evidence of uncharged crimes, dropped counts of an indictment and criminal activity resulting in acquittal.").

The Supreme Court and Second Circuit caselaw thus makes clear that this Court may consider evidence of other crimes that have been proven by a preponderance of the evidence. In this case, the proof that Colombo engaged in the loansharking offenses involving Sitterly and Kelly – counts on which the jury hung – have been proven by a preponderance of the evidence.

Consider the following: the recorded phone conversations involving Sitterly, Colombo, and Joseph Flaccavento standing alone were very powerful evidence of Colombo's loansharking crimes. During those calls, Colombo and Flaccavento discussed payments Sitterly would have to make, they discussed the weekly points (or "juice" or interest payments) that he would have to pay, and they threatened him if he failed to pay the money back.

Sitterly testified that starting in about 1994, he needed $10,000 to help pay off his debt on a house he bought in Poughkeepsie. He couldn't get a legitimate loan because he had a tax lien and owed some back taxes. Sitterly borrowed $10,000 from Nunzio Flaccavento, who acted on Colombo's behalf and was lending Colombo's money. (Tr. 1088). The terms of the loan were that Sitterly would have to make a weekly payment of 3 points, or 3 percent of the $10,000 loan. In other words, Sitterly had to pay $300 per week. There was no deadline by which he had to pay back the principal, because, as Flaccavento told him, loansharks make their money off exorbitant interest payments. Tr. 1089. Three percent per week amounts to 156 percent interest per year. That is, after a year, Sitterly had paid approximately $15,600 of interest on his $10,000 loan, without paying off any principal.

Between 1994 and 2000, Sitterly took out additional loans from Colombo for himself and on behalf of Richard Kelly, his friend and business partner. The highest total principal he owed at any one time was approximately $90,000. Tr. 1102. Sitterly estimated that he paid about $600,000 in interest during this time period. Tr. 1102.

Until in about 1999, Sitterly made his weekly payments to Nunzio Flaccavento. But in 1999, Sitterly explained that he received a panicked phone call from Nunzio's son, Joe, who told Sitterly, "Johnny, they've got a gun, Christopher has got a gun and he is going to kill my father." Tr. 1104. Joe Flaccavento told Sitterly that Colombo had learned that Nunzio had supposedly stolen money from him, and so even though Sitterly had just given Nunzio $45,000 to pay down his $50,000 principal to only $5,000, Joe begged Sitterly to just agree to whatever terms Colombo stated when he called. When Colombo and Sitterly later spoke, Colombo told Sitterly he still owed Colombo $35,000. Tr. 1104-05. Less than a year later, Sitterly was cooperating with the New York State Police.

The State Police directed Sitterly to record phone conversations with Joe Flaccavento and Colombo. The State Police also equipped Sitterly with a body wire to record his in-person meetings with Flaccavento and Colombo. As New York State Police Investigator Anthony Vanturini testified, the State Police surveilled these meetings and listened to them contemporaneously. Tr. 696-97. Vanturini explained that Sitterly's cooperation lasted from about October 2000 through May 2001, which is when the agents executed the numerous court-authorized search warrants in the case. At the State Police's direction, Sitterly made scores of recordings involving Colombo and Flaccavento. At trial, the Government offered into evidence about 21 of these recordings.

In the first of these recordings played at trial, Flaccavento told Sitterly that he asked Colombo about charging "lower points. He went [f---]ing crazy. ... 'Cause everyone else charges 6, 5, 6 points." GX 936-T, p. 2, lines 8-11. In other words, Sitterly explained, Flaccavento was telling him to be happy that Colombo was charging him only 3 points, or 3 percent, per week, rather than the 5 or 6 points that other loansharks were charging.

This conversation – and the others played at trial – is clearly about loansharking, not gambling. The Court need not rely on Sitterly's testimony alone for that premise. After all, Investigator Carillo, the Government's gambling and loansharking expert, testified that after hearing GX 936-T, for example, it was clearly a conversation about loansharking. After listening to GX 936-T, Investigator Carillo testified:

> Flaccavento is discussing a loan with John Sitterly. It's clear from the conversation, in my experience, that John Sitterly is the borrower. He is delinquent in his payments, which is obvious from the telephone call. It's also obvious that Flaccavento is talking to his superior to work out payments for the borrower.

> On the second page, on the top, he breaks down how he has to make these payments. So the borrower must have said that he couldn't make the regular $1590 weekly payment so they give him four weeks at a thousand dollars, and then in the fifth and sixth week, he has to make up in those two weeks 590 twice, which is $1180 in interest, and in the sixth week, $1180. Then he informs the borrower and then it goes back to $1590.

> Based on this conversation, what I explained to you previously with loansharking, it was obvious to me that this was a $53,000 loan at 3 points. Because they actually speak about points. He asked if he could lower the points to make the interest payments easier, and Flaccavento says, everybody else charges 6, 5, 6 points, which is a higher interest rate on a weekly basis.

Tr. 1026-27. As the Court knows, Investigator Carillo had no factual knowledge of this case. The Government called him as an expert to render his opinion at trial. And Investigator Carillo independently determined – based only on the recordings – that Sitterly's underlying debt at the time was $53,000. Indeed, Sitterly testified that this is precisely what his debt was in October 2000. Tr. 1106.

Moreover, Investigator Carillo pointed out that in the above conversation, there was a weekly interest payment since this discussion involved a loansharking debt. "A loansharking payment is usually established on the same day each week, and the principal is not of interest to the loanshark. It's just the interest that has to be paid on a weekly basis with the standard loansharking loan." In contrast, Investigator Carillo testified that gambling debts must be paid off in full every week. Tr. 1016. Joe Flaccavento himself provided further support for the fact that these conversations between him, Colombo, and Sitterly involved loansharking, not gambling, debts when he said, "The only good thing is that you're not, you're not – it's not a gambling thing. 'Cause if it was a gambling thing you'd be in big [----]ing trouble. The worst thing in the world is [to] take a free shot at him, the worst thing in the world." Tr. 1030, GX

941-T, p.13, lines 8-9.  Investigator Carillo testified that Flaccavento meant that if Sitterly's debts to Colombo were from gambling,

> the principal would be due on a weekly basis.  Loansharking, it's just the interest that has to be paid every week.  A gambling debt is something the whole balance has to be paid every week because the bookmaker sometimes needs the bettor's losses to pay other people's winnings.  He is just making it very clear it's not a gambling debt.

Tr. 1030.

The evidence from the other recordings at trial revealed many more conversations about how and when Sitterly could pay off his debt; threats made to Sitterly by both Colombo and Flaccavento that they would have to come to his house; Flaccavento's telling Sitterly that they would have to turn over his debt to another "contractor" and that Flaccavento had "seen this guy [and] ... He is not nice.  He just doesn't care about nothing."  GX 956-T, p. 5; and phone calls in which Colombo and Flaccavento screamed at Sitterly to pay his loansharking debts off. *See* GX 939-T, p. 2, line 7, and 940-T.  One of the most salient examples of these threats occurred on February 22, 2001 when Colombo, frustrated at Sitterly's late payments, screamed at Sitterly:

> Go jerk somebody else.  I'll find you somebody else to jerk. . . . All I wanna tell you is I ain't gonna be your friend and I'm gonna get away from you. . . . And I'm gonna go find another contractor and I'm gonna ask him to collect from you.

GX 950-T, p. 5, lines 12-13 and lines 27-28, and p. 6, lines 7-8.  Sitterly explained that he knew by the term "another contractor" that Colombo meant, "He's going to turn it over to some muscle to try to collect the loansharking debt from me."  Tr. 1144.  Again, Investigator Carillo corroborated Sitterly's understanding, testifying that the term "contractor" meant that Colombo would have somebody else start collecting the debt, and that it would not be Colombo next time. Tr. 1032-33.

Additional proof that the recorded conversations between Sitterly, Colombo, and Flaccavento involved loansharking came from Investigator Vanturini, who served as Sitterly's main handler, and who testified that Sitterly initially approached the State Police "for help with a loanshark debt he can no longer pay to Christopher Colombo."  Tr. 691-92.

Moreover, the money trail provided very powerful evidence of the fact that Joe Flaccavento worked with Colombo to collect Sitterly's loansharking debts.

On May 15, 2001, the day before the search warrants were executed, including the one for Colombo's residence, Investigator Vanturini testified that, at the direction of the State Police, Sitterly gave Joe Flaccavento a $1,500 payment. Investigator Mike Truncale recorded the serial numbers of those bills. On the very next day, May 16, 2001, agents searched Colombo's residence. And among other things, the agents found $1,100 near the kitchen sink. *See* GX 687.

And, indeed, the serial numbers matched. The serial numbers recorded by Investigator Truncale before agents gave the money to Sitterly to make a loansharking payment to Flaccavento the day before *matched* the money found near the kitchen sink of Colombo's house. This amounts to very powerful proof of the fact that the loansharking debt Flaccavento collected from Sitterly was on behalf of Colombo.

Taken together, all this evidence makes absolutely plain that the Court can easily find by a preponderance of the evidence that Colombo engaged in loansharking conduct.

Finally, it is worth noting that in his loansharking dealings, Colombo used concealment measures just as he had with his illegal gambling business. On January 19, 2001, Colombo met with Sitterly, who was wearing a body wire, and told him, "I can't have telephone conversations. ... Try to have limited phone conversations. This guy been sitting on a wire on me for years." GX 940-T, p. 7, line 9 and p. 12, lines 1-3. Similarly, as Investigator Carillo testified, the discussions in which Colombo and Flaccavento told Sitterly they will bring in "another contractor" are also code words. And lastly, at some point, Flaccavento instructed Sitterly to refer to him as "Bill" when he called up. *See* GX 948-T, pp. 1-2. There is no reason to take these deceptive measures unless Colombo was hiding his illegal activity.

One last point on Colombo's relevant conduct. Colombo received benefits from the extortion and fraud committed by his brother Anthony Colombo, and John Contino that victimized Domenic Fonti and EDP. As the Court will remember, the evidence demonstrated that Christopher Colombo, who did absolutely no work for EDP, actually received health care at EDP's cost. In fact, Fonti paid bi-weekly premiums for health insurance for Christopher Colombo, whom Fonti testified that he had never met and who had never worked at EDP. *See* Tr. 1652-54; GX 126A-126C (EDP's Aetna health insurance documents reflecting coverage for Christopher Colombo).

In short, Colombo's relevant conduct involving his loansharking and other activities strongly supports the Court's imposition of a stiffer sentence.

### e. Colombo's Criminal Livelihood

Another important aspect of Colombo's history and characteristics under Section 3553(a) is that he has engaged in a criminal livelihood for a long period of time. As noted above

in Section b., he conducted his illegal gambling business for at least approximately 10 years from about 1992 to 2002.

        In addition, Colombo's record of legitimate employment is spotty at best.  In contrast, at the sentencing of co-defendant Gerard Clemenza in April 2007, the Court noted that it considered as an important factor the fact that Clemenza had a long, and in the Court's view, distinguished record of working at a union job.  The same cannot be said for Colombo, who reaped enormous profits from his decade-long illegal gambling business.

        Moreover, Colombo told the Probation Officer in his PSR interview that from "1996 to about 2001, he operated two construction companies, Home Improvement City, located in the Bronx, New York, and Tiger Home Improvement, located in Staten Island, New York.[2] He reported yearly earnings ranging between $80,000 and $150,000."  PSR ¶ 122.  Colombo's claim of his yearly earnings is another lie told to the Probation Office, as his tax returns, which were seized during the search of his home, reveal.  Colombo's tax returns (which are attached as Exhibit A) from the tax filing years 1993 to 1999 reveal the following[3]:

| TAX YEAR | WAGES | GAMBLING WINNINGS | ADJUSTED GROSS INCOME |
|---|---|---|---|
| 1993 | $0 | $0 | $15,226 (of which $13,500 is unemployment compensation) |
| 1994 | $0 | $0 | $1,016 |
| 1995 | $1,728 | $17,500 | $19,657 |
| 1996 | $8,800 | $15,475 | $24,786 |
| 1997 | $0 | $15,333 | $21,681 |
| 1998 | $38,571 | $2,200 | $41,691 |
| 1999 | $0 | $14,968 | $15,352 |

_____

[2]     Tiger Home Improvement was a company owned by co-defendant John Contino.

[3]     Colombo's tax returns for tax years 1993 though 1999, which were obtained by the Government during execution of a search warrant at his home in May 2001, are attached for the Court's review (with redacted Social Security numbers), but have not been publicly filed.

This tax return data underscores again how Colombo lied to the Probation Office. As noted above, Colombo told the Probation Office that from 1996 to about 2001, he operated two construction companies, Home Improvement City and Tiger Home Improvement. Colombo told the Probation Office that he earned approximately $80,000 to $150,000 per year. As the chart above and his attached tax returns show, he reported nowhere near that income range for the years 1996 through 1999. In four of the seven tax years, he reported no wages at all. In addition, while he reported $41,691 in 1998, in all the other years, he reported no more than $24,786. And for tax years 1996, 1997, and 1999, the vast majority of his income comes from gambling winnings. Thus, either Colombo lied to the Probation Office or he failed to report hundreds of thousands of dollars in income.

Moreover, Colombo failed to report hundreds of thousands of dollars in income because he is reporting only between $2,200 and $17,500 in gambling winnings (obviously, this provision on the Form 1040 is for taxpayers to report *legal* gambling winnings anyway). But the evidence at trial showed that at times, Colombo's illegal gambling business brought in approximately $70,000 per week. This amounts to approximately $3.6 million per year. Finally, it is worth remembering that when agents searched Colombo's home on May 16, 2001, they found thousands of dollars in cash in places like the kitchen sink and in the pool table. Activity involving hiding large amounts of cash is consistent with a failure to report income to the IRS.

In short, these tax returns reveal another of Colombo's blatant lies. He has lied to Probation, and is thus lying to the Court. The Court should weigh this fact heavily when imposing sentence (and, as noted above, in determining whether to grant Colombo two points for acceptance of responsibility). Furthermore, unlike Clemenza, who worked for many years as a union employee, Colombo's tax returns from the time frame of the conduct for which he was convicted in this case make blatantly clear that he has no such work history.

### f.    Other Considerations

In his sentencing memorandum, Colombo argues that he should receive leniency because he was under strict house arrest for several years. Colombo cannot seriously advance this argument.

Unlike his co-defendant Clemenza, Colombo's pretrial bail conditions were not very restrictive at all. In contrast, Clemenza was subject to strict home confinement with electronic monitoring. He was not allowed to leave his house. Indeed, on October 14, 2004, Clemenza asked and received permission from the Court to leave his home from 7 a.m. to 8 a.m to take his son to school. Other than the usual exceptions for doctor's appointments, meetings with counsel, etc., Clemenza's bail conditions required him confined to his home.

In stark contrast, Colombo achieved less and less restrictive conditions. After his arrest on March 30, 2004, Colombo was ordered to be on home detention at a hearing before Magistrate Judge Francis on April 7, 2004. But only four months later, on August 19, 2004, at Colombo's request, the Court allowed Colombo to leave his house every day from 7 a.m. to 9 p.m.

Moreover, the Court was able to see firsthand just how "restrictive" and "onerous" Colombo's "House Arrest" really was. In 2005, HBO filmed Colombo engaging in a day in the life of his house arrest. As the Court knows, one 30-minute pilot subsequently appeared on HBO entitled, "House Arrest Starring Christopher Colombo." In the show, Colombo proceeds to make a mockery of his bail conditions, from showing strippers his electronic monitoring ankle bracelet in a strip club to hosting a late-night card game at his home. During the show, Colombo was filmed at a strip club, a Reiki therapist's office, a Bronx tailor, a church confessional, his favorite Chinese restaurant, and a nightclub. He then raced home to make his curfew, where he played poker with friends, and entertained two women who appear topless.

In November 2005, after learning about Colombo's activities involving this show, the Government sought to have the Court impose more restrictive bail conditions, but the Court denied the Government's request. The show made painfully clear that Colombo's bail conditions were hardly restricting his ability to live his life and to pursue his happiness. Indeed, the circus portrayed in the show made it quite apparent that Colombo's carousing was barely restricted at all.

For Colombo to now claim that he is entitled to a more lenient sentence because of the supposed restrictions that his bail conditions placed on his activities brings a new definition to the word "chutzpah."

Finally, the Court need not rely on the Government's argument that Colombo's bail conditions do not warrant any consideration in his sentencing. Indeed, in a recent Gangland News article discussing Colombo's jaunt to Los Angeles, the article referred to Colombo's "House Arrest" show as "an HBO half-hour docu-comedy based on the *not-so-strict* conditions that allowed him to leave his upstate home in Blooming Grove for 14 hours a day." *See* Ex. B, www.ganglandnews.com dated 2/1/08, p. 3.

In short, a thorough review of the nature and circumstances of Colombo's offense in this case as well as Colombo's background reveal a multitude of aggravating factors and no mitigating factors. Thus, these facts counsel strongly in favor of a lengthy, serious sentence.

2. **Additional Section 3553(a) Considerations**

    a. **The Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense**

    This factor weighs heavily in favor of a lengthy sentence. For the reasons stated above, only a lengthy sentence properly reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for Colombo's crimes. First, Colombo has never shown remorse for his crimes. Indeed, he recently told Gangland News, whose author Jerry Capeci bills himself as "the nation's foremost expert on the American Mafia," that he considered his gambling convictions "a petty offense."[4] *See* attached Ex. B, p. 3 (www.ganglandnews.com, dated 2/1/08). Second, with his lies about his drug use and his annual earnings, Colombo has tried to deceive the Probation Office and thus the Court. A sentence of 27 months would reflect the gravity of the offense and the need to promote respect for the law and provide just punishment for the offense.

    b. **Afford Adequate Deterrence**

    Congress and the Sentencing Commission have determined that a sentence of 21 to 27 months is appropriate in this case. For all the reasons set forth above, a sentence of 27 months' imprisonment is necessary for both specific and general deterrence; to incapacitate Colombo for a substantial period of time and to deter others from engaging in the type of conduct at issue here.

3. **Colombo's Other Sentencing Arguments**

    Two final points from Colombo's sentencing memorandum warrant a response, and both can be quickly rejected. First, Colombo seeks a downward departure "based on permanent injury suffered by the defendant as a result of government misconduct." Colombo Mem. at 6. The claim that the Government somehow engaged in misconduct in this case is both outrageous and irresponsible. Colombo cites the fact that in detention arguments, the Government portrayed Colombo as a "dangerous and violent loanshark." Colombo Mem. at 4-5. Indeed, the Government still believes that Colombo was a dangerous and violent loanshark. And despite the fact that the jury hung on most of the loansharking counts, the Government had a

---

[4] It is ironic that since Colombo and his brother Anthony Colombo argued at trial that they should not be viewed as organized crime members merely because their father was the namesake of the Colombo Organized Crime Family of La Cosa Nostra, that Colombo would indeed seek out press attention from a media outlet billing itself as "the nation's foremost expert on the American Mafia."

good-faith basis at the time of the detention arguments – and now, for that matter – to believe that Colombo had engaged for years in loansharking, which is, by definition under the criminal code, a crime of violence.  And as noted above, because we believe that Colombo engaged in loansharking based on all the evidence at trial set forth above, we are asking the Court to factor that into its determination of the proper sentence.  Moreover, there was testimony about Colombo's engaging in violence.  To wit, Sitterly testified (a) that he heard from Nunzio Flaccavento that Colombo had given a beating to Caesar Mollo;(b) that Colombo was about to have Sitterly's brother-in-law Jeffrey Booth beaten up until Sitterly agreed to pay off his debts; and (c) that Joe Flaccavento called Sitterly in a panic because Colombo had a gun and was going to kill his father Nunzio.  In addition, the Government also had evidence at the time of the detention arguments that Colombo had told Sitterly that his friend Gregory Chrysler was doing a 20-year murder rap for him (Colombo).  Thus, the Government clearly had a good-faith basis to portray Colombo as a dangerous and violent loanshark.  Colombo's motion for a downward departure on this basis should be rejected.

Finally, Colombo now argues that imprisoning him would deprive him of certain career opportunities in television.  As the Court is well aware, this claim is totally irrelevant to the Court's consideration of an appropriate sentence for his crimes.  All defendants facing imprisonment lose out on career or other life opportunities.  Moreover, as soon as Colombo sought the Court's permission last month, over the Government's objection, to travel to California, it was clear that the inevitable follow-up request would be for the Court not to imprison him because he would lose out on career opportunities.  Colombo will have plenty of time to pursue these career opportunities after he serves his term of imprisonment.  Colombo's argument here falls short.

## <u>Conclusion</u>

   For all these reasons, it is this Office's position that the Court should sentence defendant Christopher Colombo to a term of 27 months' imprisonment.

       Respectfully submitted,

       MICHAEL J. GARCIA
       United States Attorney
       Southern District of New York


     By:  _____
       Jason P.W. Halperin / Lisa A. Baroni
       Assistant United States Attorneys
       (914) 993-1933 / (212) 637-2405

Attachments

cc:  Jeremy Schneider, Esq. (by Fedex)
   PO Ross Kapitansky (by Fedex)